No. 24-30489

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA; STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF KANSAS; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING,

*Plaintiffs-Appellees*,

v.

JOSEPH R. BIDEN, JR.; UNITED STATES DEPARTMENT OF ENERGY; JENNIFER GRANHOLM; DAVID M. TURK; GERI RICHMOND; BRAD CRABTREE; AMY SWEENEY,

*Defendants-Appellants*.

Appeal from the U.S. District Court for the
Western District of Louisiana, No. 2:24-cv-406 (Hon. James D. Cain)

## BRIEF FOR APPELLANTS

*Of Counsel:*

SAMUEL T. WALSH
*General Counsel*

COURTNEY MEYER
LILA NOJIMA
*Attorneys*
U.S. Department of Energy

TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
ARIELLE MOURRAIN JEFFRIES
   *Attorneys, Appellate Section*
   *Environment and Natural*
   *Resources Division*
   *U.S. Department of Justice*
   *Post Office Box 7415*
   *Washington, D.C. 20044*
   *(202) 532-3140*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as Defendants-Appellants are government entities and government officials sued in their official capacities. 5th Cir. R. 28.2.1.

s/ *Arielle Mourrain Jeffries*
ARIELLE MOURRAIN JEFFRIES

## STATEMENT REGARDING ORAL ARGUMENT

Defendants respectfully request oral argument. Defendants believe oral argument would provide substantial assistance to this Court in understanding the issues in the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. i

STATEMENT REGARDING ORAL ARGUMENT ..................................... ii

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION .................................................3

STATEMENT OF THE ISSUES.......................................................4

STATEMENT OF THE CASE...........................................................4

     A.     Statutory and regulatory background ......................................4

          1.     The Natural Gas Act ...........................................................4

               a.     The Department's adjudication process ...............................5

               b.     Judicial review .........................................................8

          2.     The Administrative Procedure Act...................................9

     B.     Factual background.................................................................10

          1.     Recent developments in natural-gas markets.................................................................10

          2.     The 2024 update .........................................................12

          3.     The update's effect on pending adjudications ...................................................13

     C.     Procedural background.............................................................15

SUMMARY OF ARGUMENT ......................................................19

STANDARD OF REVIEW .............................................................21

ARGUMENT ...............................................................................22

I.    Plaintiffs fail to challenge agency action, much less
      final agency action under the APA. ....................................22

II.   The Natural Gas Act vests exclusive subject-matter
      jurisdiction over Plaintiffs' claims in the courts of
      appeals. ..............................................................................33

              1.    The Natural Gas Act precludes the district
                    court from exercising jurisdiction. ..................34

              2.    Plaintiffs' claims are of the type that
                    Congress intended to be reviewed
                    exclusively in the courts of appeals. ...............40

              3.    Plaintiffs cannot bypass the exclusive
                    judicial review scheme established by
                    Congress. .........................................................48

III.  Plaintiffs lack Article III standing. ...................................54

      A.    Plaintiffs failed to establish standing to sue the
            federal government for indirect and speculative
            future losses in revenue. .........................................55

      B.    Plaintiffs' lack of standing is even clearer with
            respect to their claims against the President. .........64

CONCLUSION ...........................................................................67

CERTIFICATE OF SERVICE .....................................................68

CERTIFICATE OF COMPLIANCE ............................................69

# TABLE OF AUTHORITIES

## Cases

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) .................................................................24, 26, 53

*Adorers of the Blood of Christ v. FERC,*
  897 F.3d 187 (3d Cir. 2018) .................................................. 43

*Alabama-Coushatta Tribe of Tex. v. United States,*
  757 F.3d 484 (5th Cir. 2014).........................................23, 24, 25, 26, 27

*Am. Energy v. Rockies Exp. Pipeline,*
  622 F.3d 602 (6th Cir. 2010)......................................................35, 36, 38

*Am. Petroleum Inst. v. EPA,*
  216 F.3d 50 (D.C. Cir. 2000) ...................................................... 28

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n,*
  546 F.2d 983 (D.C. Cir. 1976) ...................................................53

*Apter v. Dep't of Health & Hum. Servs.,*
  80 F.4th 579 (5th Cir. 2023) ...................................................... 23

*Ark. La. Gas Co. v. Hall,*
  453 U.S. 571 (1981) ...................................................................... 36

*Atlanta Gas Light Co. v. Federal Power Comm'n,*
  476 F.2d 142 (5th Cir. 1973).......................................................37

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
  598 U.S. 175 (2023) ..............................................................40, 41, 42

*Bank of La. v. FDIC,*
  919 F.3d 916 (5th Cir. 2019) ...................................................... 34

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017)..............................................4, 21, 22, 66

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...................................................................... 27

*Borden v. Allstate Ins.*,
 589 F.3d 168 (5th Cir. 2009) ............................................................... 21

*Bowen v. Massachusetts*,
 487 U.S. 879 (1988) ............................................................................. 52

*Bywater Neighborhood Ass'n v. Tricarico*,
 879 F.2d 165 (5th Cir. 1989) ................................................... 45, 46, 52

*California Save Our Streams Council, Inc. v. Yeutter*,
 887 F.2d 908 (9th Cir. 1989) ............................................................... 36

*City of Tacoma v. Taxpayers of Tacoma*,
 357 U.S. 320 (1958) ....................................................................... 35, 36

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ....................................................................... 55, 58

*Consol. Gas Supply Corp. v. FERC*,
 611 F.2d 951 (4th Cir. 1979) ......................................................... 36, 37

*Dalton v. Specter*,
 511 U.S. 462 (1994) ............................................................................. 23

*Daniels Health Scis. v. Vascular Health Scis.*,
 710 F.3d 579 (5th Cir. 2013) ............................................................... 22

*Dep't of Commerce v. New York*,
 588 U.S. 752 (2019) ............................................................................. 64

*El Paso County v. Trump*,
 982 F.3d 332 (5th Cir. 2020) ..................................................... 57, 58, 59

*Elgin v. Dep't of Treasury*,
 567 U.S. 1 (2012) ........................................................................... 41, 48

*Florida Power & Light Co. v. Lorion*,
 470 U.S. 729 (1985) ....................................................................... 34, 54

*Florida v. Mellon*,
 273 U.S. 12 (1927) ............................................................. 55, 56, 57, 58

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ....................................................................56, 57, 66

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) ................................................................................64, 65

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
 561 U.S. 477 (2010) ........................................................................41, 42

*Geyen v. Marsh*,
 775 F.2d 1303 (5th Cir. 1985) ...............................................................23

*Haaland v. Brackeen*,
 599 U.S. 255 (2023) ...............................................................................58

*Healthy Gulf v. FERC*,
 107 F.4th 1033 (D.C. Cir. 2024) ..........................................................14

*Heckler v. Ringer*,
 466 U.S. 602 (1984) .....................................................47, 49, 50, 51, 52

*In re Howard*,
 570 F.3d 752 (6th Cir. 2009) .................................................................45

*Jeter v. Astrue*,
 622 F.3d 371 (5th Cir. 2010) .................................................................22

*Jiao v. Xu*,
 28 F.4th 591 (5th Cir. 2022) ..................................................................22

*JTB Tools & Oilfield Servs. v. United States*,
 831 F.3d 597 (5th Cir. 2016) ..............................................35, 44, 45, 47

*Ligon v. LaHood*,
 614 F.3d 150 (5th Cir. 2010) ....................................................34, 38, 40

*Loper Bright Enterprises v. Raimondo*,
 144 S. Ct. 2244 (2024) ...........................................................................48

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ..........................................................................54, 55

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ............................................................ 63

*New York Republican State Comm. v. SEC,*
    799 F.3d 1126 (D.C. Cir. 2015) ............................................. 53

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) .......................................................... 6, 9, 27

*Peoples Nat'l Bank v. Office of the Comptroller of the Currency,*
    362 F.3d 333 (5th Cir. 2004) ............................................ 27, 32

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ............................................... 2, 25

*Sierra Club v. U.S. Dep't of Energy,*
    867 F.3d 189 (D.C. Cir. 2017) ................................... 5, 6, 31, 61

*Sierra Club v. U.S. Dep't of Energy,*
    703 Fed. App'x 1 (D.C. Cir. 2017) ........................................ 61

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .......................................................... 54, 55

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................. 59

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ............................................................. 54

*Telecommc'ns Rsch. & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ..................................... 35, 44, 45

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ..................................... 23, 31, 32

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................................. 56

*Thunder Basin Coal v. Reich,*
    510 U.S. 200 (1994) ............................................. 16, 42, 43, 48

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................... 64

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) ............................................. 56

**Statutes**

5 U.S.C. § 702 ................................................................... 22, 24

5 U.S.C. § 703 ..................................................................... 9, 52

5 U.S.C. § 704 ...................................................... 9, 23, 27, 52

5 U.S.C. § 705 .......................................................................... 15

5 U.S.C. § 706 ............................................................................ 9

15 U.S.C. § 717 .......................................................................... 4

15 U.S.C. § 717b ............................................................... 4, 5, 6

15 U.S.C. § 717f ....................................................................... 36

15 U.S.C. § 717r .......................... 8, 9, 27, 35, 39, 40, 41, 44, 48

28 U.S.C. § 1292 ........................................................................ 4

28 U.S.C. § 1331 ................................................................. 3, 34

42 U.S.C. § 4321 ........................................................................ 5

**Regulations**

48 Fed. Reg. 34,501 (July 29, 1983) ......................................... 8

77 Fed. Reg. 73,627 (Dec. 11, 2012) ......................................... 8

79 Fed. Reg. 48,132 (Aug. 15, 2014) ......................................... 6

# INTRODUCTION

The Natural Gas Act requires the Department of Energy to ensure that the export of liquefied natural gas to countries without free-trade agreements is not inconsistent with the public interest. To make that determination, the Department relies, in part, on economic and environmental studies. Those studies help the Department understand, among other things, how increasing exports will affect American consumers by altering domestic supplies and prices for natural gas, and thus affect the public interest.

The Department periodically updates its studies to ensure that it relies on up-to-date information in adjudicating export applications. The most recent economic and environmental analyses were published in 2018 and 2019, respectively. At that point, liquefied-natural-gas exports were just getting underway. Since then, export capacity has more than tripled, the United States has become the world's leading exporter of liquefied natural gas, and the Russia-Ukraine war has transformed global markets. Recognizing those significant shifts, among others, the Department announced in January 2024 that it was updating its economic and environmental studies and would temporarily defer

decisions on pending long-term, non-free-trade-agreement export applications until it had up-to-date studies.

Louisiana and 15 other States sued the Department, the President, and agency officials, alleging that the Department's deferral of final decisions was unlawful. Plaintiffs also sought a preliminary injunction. The district court, in an order denying Defendants' motion to dismiss and granting Plaintiffs' request for a preliminary injunction, enjoined all Defendants from "halting and/or pausing the approval process for pending and future applications for [liquefied-natural-gas] exports of liquified natural gas to non-[free-trade-agreement] countries, effective immediately." ROA.1425-26.

But the district court lacked jurisdiction over Plaintiffs' abstract challenge to the Department of Energy's approach to processing applications to export liquefied natural gas, for three reasons. First, Plaintiffs' complaint is untethered to any final agency action. Instead, their suit broadly challenges the Department's general approach to reviewing export applications across multiple pending adjudications, transgressing the well-settled "prohibition on programmatic challenges." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (en banc).

Second, the Natural Gas Act vests exclusive jurisdiction over the Department's adjudication of export applications in the courts of appeals and therefore precludes Plaintiffs from filing their claims in district court. Although the district court concluded that it had jurisdiction because Plaintiffs' challenge was unrelated to final orders in export proceedings, the district court's injunction implicitly compelled the Department to issue orders in pending proceedings based on outdated studies. Only the courts of appeals have jurisdiction over claims related to export orders. Third, Plaintiffs lack standing because they allege only indirect, speculative injuries to state revenues.

This Court should vacate the district court's order and instruct the district court to dismiss the complaint for lack of jurisdiction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331. ROA.32. *But see infra* pp. 22-66 (arguing the district court lacked jurisdiction). The district court entered a preliminary injunction and denied Defendants' motion to dismiss in a single order and accompanying memorandum opinion on July 1, 2024. ROA.1363-1424; ROA.1425-26. Defendants timely appealed on August 5,

2024. ROA.1435-36; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). *See Barber v. Bryant*, 860 F.3d 345, 358 (5th Cir. 2017).

## STATEMENT OF THE ISSUES

1. Whether Plaintiffs challenge an agency action that is final within the meaning of the APA.

2. Whether the Natural Gas Act's exclusive judicial-review provision precluded the district court from exercising subject-matter jurisdiction over Plaintiffs' claims.

3. Whether Plaintiffs lack standing.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    The Natural Gas Act

The Natural Gas Act, 15 U.S.C. § 717 et seq., provides that any person seeking to import natural gas or export natural gas from the United States must obtain an order from the Department of Energy authorizing it to do so. 15 U.S.C. § 717b(a). The Natural Gas Act bifurcates the authorization process. For applications to export liquefied natural gas to countries with which the United States has entered into a

"free-trade agreement requiring national treatment for trade in natural gas" (free-trade-agreement countries), exports "shall be deemed to be consistent with the public interest" and "granted without modification or delay." *Id.* § 717b(c). For exports to countries with which the United States has not entered into such a free trade agreement, and with which trade is not prohibited by U.S. law or policy (non-free-trade agreement countries), the Department "shall issue" an export order "upon application, unless, after opportunity for hearing," the Department "finds that the proposed exportation . . . will not be consistent with the public interest." *Id.* § 717b(a).

### a.    The Department's adjudication process

Before ruling on an application to export liquefied natural gas to a non-free-trade-agreement country, the Department must take two steps. First, the Department must comply with the National Environmental Policy Act (NEPA).[1] 42 U.S.C. § 4321 et seq.; *see Sierra Club v. U.S. Dep't*

---

[1] Typically, the federal agency responsible for permitting the export facility—either the Federal Energy Regulatory Commission or the Maritime Administration, depending on where the facility is located— serves as the lead agency in the NEPA review process, and the Department serves as a cooperating agency. But if another agency is not already preparing an environmental impact statement in connection

*of Energy (Sierra Club I)*, 867 F.3d 189, 192 (D.C. Cir. 2017). NEPA
requires federal agencies to evaluate and consider the environmental
effects of "major Federal actions significantly affecting the quality of the
human environment." *Norton v. S. Utah Wilderness All. (SUWA)*, 542
U.S. 55, 72 (2004).

Second, the Department must conduct an informal adjudication of
each export application—including "opportunity for hearing," 15 U.S.C.
§ 717b(a)—to ensure that the proposed exportation is not inconsistent
with the public interest. In each adjudication, the Department applies a
"general presumption favoring [export] authorization," such that it will
approve each application unless it determines that the proposed
exportation would not be consistent with the public interest. *Sierra Club
I*, 867 F.3d at 203.

The Department issues final decisions only once it "has sufficient
information on which to base a public interest determination."
Procedures for Liquefied Natural Gas Export Decisions, 79 Fed. Reg.
48,132, 48,135 (Aug. 15, 2014). In making the public-interest

---

with approval of the proposed export facility, the Department conducts
its own NEPA analysis.

determination required by statute, the Department relies on the information it gathers through the adjudication process, such as the materials submitted by the applicant, any intervenors, and public comments. ROA.1022. The Department also considers studies that it develops through a public process to establish a baseline understanding of the potential economic and environmental effects of export authorizations. ROA.1022.

Those economic and environmental studies are critical components of the Department's public-interest review. ROA.1082. To keep pace with the rapidly changing natural-gas market, the Department periodically commissions updated studies from its National Laboratories and other sources that provide up-to-date data on the economic and environmental effects of liquefied-natural-gas exportation. ROA.1092. For example, the economic studies have analyzed how "exports may impact U.S. natural gas prices, Gross Domestic Product, household income, consumer welfare, and other metrics affecting the public interest." ROA.1029-30.

The studies are highly technical and take substantial time and effort to develop. ROA.1092. The Department commissioned economic studies in 2012, 2014, 2015, and 2018 and environmental studies in 2014

7

and 2019. ROA.1140-42. It has now been six years since the Department's economic studies were last updated, and five years since the most recent of the environmental studies was last updated. ROA.1140-42.

When the Department needs to update the information that it relies on in its adjudications, it sometimes defers final decisions on pending applications. In 2012, for example the Department postponed decisions on 15 pending liquefied-natural-gas export applications until it finished developing a new economic study. 2012 LNG Export Study, 77 Fed. Reg. 73,627, 73,629 (Dec. 11, 2012). And in 1983, in the context of import applications, the Department deferred final decisions on 20 natural-gas import applications so it could reassess its applicable criteria for importing natural gas. Review of Government Policy in Authorizing Imports of Natural Gas, 48 Fed. Reg. 34,501 (July 29, 1983).

### b.    Judicial review

The Natural Gas Act includes an exclusive judicial-review provision, 15 U.S.C. § 717r(b). "Any party to a proceeding" under Section § 717b(a) who is "aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order" in the D.C. Circuit, or in the regional circuit in which the affected natural-gas company does

business, after applying for rehearing with the Department of Energy. *Id.* § 717r(a)-(b). Upon the filing of a petition for review and the administrative record, the court of appeals has "exclusive" jurisdiction to "affirm, modify, or set aside" the Department's orders on export applications "in whole or in part." *Id.* Case law establishes that the exclusive review scheme also encompasses challenges to preliminary actions that precede the Department's orders, and any claims for inaction or unreasonable delay in issuing final orders. *See infra* pp. 35-37.

### 2.    The Administrative Procedure Act

The Administrative Procedure Act (APA) allows judicial review of certain agency actions. The APA limits review to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. In addition, when an agency fails "to take a discrete agency action that it is required to take," the APA allows courts to "compel" that specific action. *SUWA*, 542 U.S. at 64; 5 U.S.C. § 706(1). The APA also makes clear that when a separate statute provides the "form of proceeding for judicial review," including by specifying the court in which an action must be filed, the separate statute controls. 5 U.S.C. § 703.

B.    Factual background

1.    Recent developments in natural-gas markets

In the last decade, liquefied-natural-gas exportation from the United States has grown exponentially. The United States has shifted from a net importer of liquefied natural gas to the world's largest exporter. ROA.1033-37. Since 2018, when the Department last updated its study of the economic effects of liquefied-natural-gas exportation, the volume of liquefied natural gas approved for export has more than doubled. ROA.1086. Operating export capacity has more than tripled. ROA.1086. And actual exports have quadrupled. ROA.1036. Moreover, capacity to export liquefied natural gas continues to grow. The United States is currently on track to exceed the export capacity of any other country by about 40 percent, with exports expected to nearly double by the end of this decade. ROA.1088; ROA.1099.

Liquefied-natural-gas exports affect the price of natural gas domestically. The United States Energy Information Administration recently found that "higher [liquefied-natural-gas] exports create a tighter domestic natural gas market (all else held equal), increasing domestic natural gas prices." ROA.1088. And in November 2023, more

than 60 U.S. Senators and Representatives submitted a letter to the Secretary of Energy stating that "[i]t is critical that [the Department of Energy] assess . . . consumer impacts when determining whether exports are in the public interest" and urging the Department to consider "the effect that . . . additional exports will have on U.S. consumers." ROA.1088. The Department has recognized that it needs to consider how expanding natural-gas export capacity could affect American households and manufacturers. ROA.1088.

Moreover, recent international events, including Russia's invasion of Ukraine and the growing use of energy as a weapon to undermine national security, have further transformed the global natural-gas market. Before the invasion of Ukraine, much of Europe relied on natural gas from Russia. ROA.1046. Over the last two years, many European countries have pivoted to rely on liquefied natural gas from the United States, which has been key to helping backfill lost gas supplies from Russia. ROA.1046. The Department's prior studies did not account for the market impacts of the Russian invasion of Ukraine or the dramatic reduction in the share of Russian natural gas supplies into Europe and Central Asia. ROA.1089.

## 2. The 2024 update

At the beginning of this year, the Department found that "given significant changes in the [liquefied-natural-gas] market, global energy needs, and geopolitical changes, among other developments since the studies were last updated, [the Department] needs updated market information and analytical approaches to fulfill its statutory obligation to evaluate the public interest under Section 3(a) of the Natural Gas Act." ROA.1090. So, on January 26, 2024, the Department issued a statement providing public notice that it would update the studies it uses to inform its public-interest determinations. ROA.1045-47. The Department announced that it would temporarily defer final decisions on long-term applications to export liquefied natural gas to non-free-trade-agreement countries while it finalizes the updated studies. ROA.1050.

The same day, the White House issued a statement highlighting the Department's update. ROA.50. In the statement, the President noted that his Administration was "announcing today a temporary pause on pending decisions of Liquefied Natural Gas exports—with the exception of unanticipated and immediate national security emergencies." ROA.50. The President explained that "[d]uring this period, [the Department of

Energy] will take a hard look at the impacts of [liquefied-natural-gas] exports on energy costs, America's energy security, and our environment." ROA.50.

Once the updated studies are complete, the Department will initiate a 60-day public-comment period, after which it will review and respond to comments. ROA.1091. Still, the process will take months, not years, and the Department expects to complete its process by the end of the first quarter of 2025. ROA.1091. In the meantime, the temporary deferral of final decisions is "subject to exception for unanticipated and immediate national security emergencies." ROA.1047.

### 3.    The update's effect on pending adjudications

When the update was announced in January 2024, there were four pending applications that were ready for final action pending a public-interest determination. ROA.1097. Those four applications concern two projects in Louisiana, one in Texas, and one off the coast of Mexico (involving U.S.-sourced liquefied natural gas). ROA.1097. When the update was announced, there were also three other pending applications for which the Department was (or anticipated being) the lead agency for the environmental review under NEPA. ROA.1097. Those projects were

not ready for a final export decision because the NEPA analysis was not complete, but they were potentially affected by the update because the Department's NEPA analysis would rely, in significant part, on the updated studies. One of those three proposed projects is in Mexico. ROA.1097. The other two are in Louisiana. ROA.1097. So in total, there were seven applications potentially affected by the update before the district court's preliminary injunction.[2]

Only new or pending long-term applications to export liquefied natural gas to non-free-trade-agreement countries from large-scale

_____

[2] On June 27, 2024, the Federal Energy Regulatory Commission approved Venture Global's CP2 export facility. *See* Venture Global CP2 LNG, LLC and Venture Global CP Express, LLC Order Granting Authorizations Under Sections 3 of the Natural Gas Act, FERC Docket Nos. CP22-21-000 and CP22-22-000, 187 FERC ¶ 61,199 (2024). That application, which was not ready for final action at the time the complaint was filed or when the injunction was entered, now awaits a final export decision from the Department of Energy. And on August 31, 2024, the Department granted NFE Altamira's application to re-export U.S.-sourced natural gas from Mexico to non-free-trade-agreement countries. *See* Department of Energy, Order No. 5156, Docket No. 22-110-LNG (August 31, 2024). Thus, as of the date this brief is filed, the list of applications that (but for the preliminary injunction) would be affected by the update has changed slightly, but the number remains at seven. Furthermore, on July 16, 2024, the D.C. Circuit remanded the NEPA analysis for Commonwealth LNG's export project to the Federal Energy Regulatory Commission for further review. *Healthy Gulf v. FERC*, 107 F.4th 1033, 1038 (D.C. Cir. 2024).

facilities are affected by the need for updated studies. ROA.1093. Past authorizations are not affected by the update, and many other categories of new LNG export applications are unaffected, including: (1) exports to free-trade-agreement countries; (2) exports of liquefied natural gas previously imported from foreign sources; (3) qualifying small-scale exports of natural gas, including to non-free-trade-agreement countries; and (4) applications requesting commencement extensions from current liquefied natural gas export authorization holders. ROA.1093; ROA.1050. The Department may also consider an exception if there is a demonstrated need based on an unanticipated or immediate national security emergency. ROA.1047.

### C.   Procedural background

In March 2024, two months after the Department announced the update, Louisiana and 15 other States filed suit in the Western District of Louisiana against the President, the Department of Energy, the Secretary of Energy, and four other agency officials, alleging that they had violated the APA and acted ultra vires by pausing final export authorizations. ROA.69-86. One week later, Plaintiffs sought a preliminary injunction (or, in the alternative, a stay under 5 U.S.C. § 705)

that would bar the Department and other defendants from implementing the pause—which they characterized as an "Export Ban"—while the case proceeds. ROA.167. Defendants cross-moved to dismiss the complaint for lack of jurisdiction and, as to many of the complaint's sixteen counts, failure to state a claim. ROA.929.

The district court denied the motion to dismiss (except as to the APA claims against the President) and granted a preliminary injunction against all named defendants, including the President. ROA.1363-1424. The district court rejected each of Defendants' three jurisdictional arguments in support of dismissal and denial of the preliminary injunction. First, the court found that the provision in Section 717r(b) granting the courts of appeals exclusive jurisdiction to review any "order" issued in a proceeding seeking export authorization did not deprive it of jurisdiction to consider Plaintiffs' claims because Plaintiffs did not challenge a final order. *See* ROA.1375-76. And looking to the factors identified in *Thunder Basin Coal v. Reich*, 510 U.S. 200 (1994), the court also concluded that Section 717r does not reflect an implicit congressional intent to foreclose APA suits like this one. ROA.1374-76.

Second, the district court held that Plaintiffs had standing. It concluded that the "LNG Export Ban" would delay or prevent billions of dollars' worth of construction activity (primarily in Texas and Louisiana), thereby delaying or eliminating substantial tax collection by Plaintiff States. ROA.1379-82. The court concluded that the revenue reductions are "substantially likely to occur" if the "Ban" remains in place, and that enjoining the "Ban" would "necessarily redress Plaintiff States' injuries." ROA.1386.

Third, the district court concluded that the "Ban" is final agency action reviewable under the APA. ROA.1387-89. The court agreed with Plaintiffs that the "Ban" "is the consummation of the decisionmaking process because it immediately and finally decides that export applications should not be considered until the (undisclosed) date at which the (not-public) review of the public-interest determination will be completed." ROA.1388.

The district court then turned to the merits of Plaintiffs' claims. ROA.1389-1402. The court denied the motion to dismiss in all respects except for the APA claims against the President. The court found that the APA claims against the President should be dismissed because the

President is not subject to suit under the APA. ROA.1391. The court, however, declined to dismiss Plaintiffs' claim that the President acted ultra vires in announcing the update. ROA.1401. The district court concluded that Plaintiffs are likely to succeed on all their other claims. ROA.1408.

Finally, the district court determined that other equitable factors supported a preliminary injunction. ROA.1413-23. It found that Plaintiffs would suffer irreparable financial harm if the pause continued. ROA.1414-17. The court also found that the Department would not be harmed by being forced to rely on outdated studies, relying on what it understood to be a concession at oral argument by the Department's counsel that "three (3) reports/studies used as part of the public interest analysis are continually updated," even though the transcript makes clear that *Plaintiffs' counsel* made this statement. ROA.1418; ROA.1490. And the court found that an injunction would be in the public interest because it would contribute to the national economy. ROA.1418-19.

The district court ordered that the Department, its officials, and the President are "ENJOINED AND RESTRAINED, from halting and/or pausing the approval process for pending and future applications for

[liquefied-natural-gas] exports of liquified natural gas to non-[free-trade-agreement] countries, effective immediately." ROA.1425-26.

## SUMMARY OF ARGUMENT

1. Sovereign immunity bars Plaintiffs' claims, which do not fit within the APA's waiver of sovereign immunity. Rather than challenging a discrete agency action, Plaintiffs attack the Department's approach to adjudications wholesale—the kind of programmatic challenge that the Supreme Court and this Court have explained is not permitted under the APA. Moreover, the Department's update of its studies, and the accompanying deferral of final decisions, does not satisfy the APA's requirement of "final agency action." The update is only a step in the Department's adjudication process, not a final action. And the Department's public notice of the update was purely informational and did not determine any rights or obligations.

2. The Natural Gas Act's detailed and exclusive scheme for judicial review of orders issued by the Department of Energy during administrative adjudications deprived the district court of jurisdiction over Plaintiffs' claims. The Act authorizes judicial review only in courts of appeals, not district courts. Plaintiffs may not circumvent Congress'

exclusive path for judicial review by preemptively suing in district court to enjoin ongoing agency proceedings. Under this Circuit's law, the Act's review scheme, which encompasses all challenges to the Department's final orders, also necessarily includes challenges to preliminary actions that precede those orders, and any claims for inaction or unreasonable delay in issuing final orders. Otherwise, litigants who prefer district court would always attempt to bypass the courts of appeals' exclusive jurisdiction by preemptively filing suit ahead of a final order by the Department. The district court's conclusion that Plaintiffs can avoid the exclusive review scheme because they do not challenge "how the Secretary wielded her power in a particular application proceeding," Op. 13, only runs into another jurisdictional problem—the APA's prohibition on programmatic challenges. Plaintiffs cannot evade Congress's exclusive review scheme by bringing a doubly defective action.

3. Plaintiffs lack standing. Plaintiffs have no direct stake in the pending export applications, and they identify no direct financial injury from a temporary delay in pending adjudications. Instead, they posit an attenuated path to harm, arguing that any delay by the Department in approving export applications will reduce private investment in export

facilities, thereby reducing natural-gas production in their States and associated severance tax and royalty revenues from natural-gas production. But such indirect, derivative effects of federal policies do not constitute a judicially cognizable injury. And even if indirect effects could qualify as an Article III injury, Plaintiffs' assertions are wholly speculative and not readily redressable because they rely on an array of unsupported assumptions about the independent business decisions of third parties.

At a minimum, Plaintiffs' claims against the President should be dismissed because Plaintiffs fail to show how the challenged White House statement will cause them any concrete injury that would be redressable by any available judicial remedy.

This Court should vacate the district court's preliminary injunction order and instruct the district court to dismiss the complaint for lack of jurisdiction. *See Barber*, 860 F.3d at 350 (reversing preliminary injunction and rendering a judgment of dismissal).

## STANDARD OF REVIEW

Questions of subject-matter jurisdiction are reviewed de novo. *Borden v. Allstate Ins.*, 589 F.3d 168, 170 (5th Cir. 2009). The grant of

preliminary injunctive relief is reviewed for abuse of discretion, with conclusions of law reviewed de novo and findings of fact reviewed for clear error. *Daniels Health Scis. v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013). Any error of law, including an erroneous conclusion as to the existence of jurisdiction, is an abuse of discretion. *Jeter v. Astrue*, 622 F.3d 371, 376 (5th Cir. 2010).

## ARGUMENT

Plaintiffs' case is an abstract challenge to the way the Department of Energy processes applications to export liquefied natural gas, divorced from any final agency action or any particular export proceeding that might concretely affect a judicially protected interest. As a result, their suit is precluded on three independent jurisdictional grounds: sovereign immunity, statutory subject-matter jurisdiction, and standing. This Court should therefore vacate the preliminary injunction and direct dismissal for lack of jurisdiction. *See Barber*, 860 F.3d at 358; *see also Jiao v. Xu*, 28 F.4th 591, 596 (5th Cir. 2022).

## I. Plaintiffs fail to challenge agency action, much less final agency action under the APA.

This Court has held that to establish a waiver of sovereign immunity under 5 U.S.C. § 702, the plaintiff "must identify some 'agency

action' affecting him in a specific way, which is the basis of his entitlement for judicial review." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). Moreover, Plaintiffs must identify a *final* agency action within the meaning of the APA to invoke the court's jurisdiction. 5 U.S.C. § 704; *see Texas v. EEOC,* 933 F.3d 433, 441 (5th Cir. 2019). Plaintiffs have failed to do so.[3] Instead, they seek to challenge the Department's approach to analyzing export applications in general.

1.    Precedent squarely forecloses Plaintiffs' programmatic challenge. In *Lujan v. National Wildlife Fed'n*, an environmental group

---

[3] Plaintiffs also do not identify a waiver of sovereign immunity for their "ultra vires" claims. It is unclear whether Plaintiffs purport to rely on "common-law *ultra vires* doctrine" or attempt to "use the APA to assert their ultra vires claims." *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 593 (5th Cir. 2023). This Court has noted that Congress " 'd[id] away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity' when it amended the APA in 1976." *Id.* (quoting *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985)). And if Plaintiffs' ultra vires claims are raised under the APA, then they must identify some specific agency action that is purportedly ultra vires to invoke the APA's waiver of sovereign immunity. *See id.* As explained in this Part, Plaintiffs have identified no agency action that would permit them to invoke the APA's waiver of sovereign immunity. Nor have Plaintiffs identified a waiver of sovereign immunity for their claims against the President, for whom the APA's sovereign-immunity waiver would not apply. *See Dalton v. Specter*, 511 U.S. 462, 470 (1994).

sought to challenge the Bureau of Land Management's "land withdrawal review program" as a whole rather than challenging a "particular 'agency action' that cause[d] it harm," like "a single [] order or regulation." 497 U.S. 871, 890-91 (1990). The "land withdrawal program," like the purported "Export Ban" here, was "simply the name by which" the plaintiffs referred to the "operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications." *Id.* at 890. The Supreme Court held that the program was "not an 'agency action' within the meaning of § 702." *Id.* at 890.

That decision, this Court has explained, "announced a prohibition on programmatic challenges—challenges that seek wholesale improvement of an agency's programs by court decree, rather than through Congress or the agency itself." *Alabama-Coushatta*, 757 F.3d at 490 (cleaned up). Thus, in *Alabama-Coushatta*, this Court held that there was no "agency action" where a Tribe contended that "all of the leases, permits, and sales administered by multiple federal agencies" were unlawful. *Id.* And in *Sierra Club v. Peterson*, this Court sitting en banc rejected a suit that challenged the Forest Service's timber-

management practices throughout Texas forests rather than focusing on "individual timber sales." 228 F.3d at 566-69.

Plaintiffs here bring the same kind of programmatic challenge that was rejected in those cases. Rather than challenge a "particular and identifiable action" that harms them, *Alabama-Coushatta*, 757 F.3d at 491, they seek review of the manner and rate at which the Department is processing pending export applications. Much like the plaintiffs in *Lujan*, who purported to challenge a "land withdrawal program," Plaintiffs here challenge what they style an "Export Ban." But the purported "Ban," divorced from Plaintiffs' label, is simply a temporary delay in several specific export adjudications. The Department of Energy recognized that before it could issue final decisions on the pending applications, it needed to update its studies to obtain sufficient information to render final decisions, as it has in the past. Plaintiffs' challenge is no more than a request for the district court to overhaul the Department's adjudicatory practices—a classic programmatic challenge.

Plaintiffs may prefer that the Department act more quickly and grant all pending applications. But while a "case-by-case approach" does

not offer "as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire," it is "the traditional, and remains the normal, mode of operation of the courts." *Lujan*, 497 U.S. at 894. Plaintiffs cannot ask the courts to impose "wholesale improvement of" the Department's processes "by court decree." *Alabama-Coushatta*, 757 F.3d at 490. Instead, if Plaintiffs believe that the Department's approach in any particular adjudication is unlawful, they must challenge the associated export grant or denial. And if they believe the Department has impermissibly delayed an adjudication, they must challenge that particular delay in issuing a specific order.

Plaintiffs have also failed to identify a waiver of sovereign immunity for their unreasonable-delay claim under APA Section 706(1) because they identify no discrete action that the Department was legally required—but failed—to take. As Plaintiffs themselves explained: "As an alternative argument, Plaintiffs allege Defendants unlawfully delayed statutorily required LNG export application decisions across the board, but that claim is unrelated to any particular proceeding and the relief sought would not mandate a decision in any particular

proceeding." ROA.1212 (citation omitted). Because the APA waives sovereign immunity only for claims that "an agency failed to take a *discrete* agency action," *SUWA*, 542 U.S. at 64, Plaintiffs' concession dooms their attempt to invoke the district court's jurisdiction. To be clear and as explained below (pp. 44-45), an aggrieved plaintiff with standing could bring an unreasonable-delay claim related to a particular application pursuant to 15 U.S.C. § 717r.

2. Even if the Department of Energy's general approach to adjudications could be considered a discrete "agency action," it would not be "final agency action," a separate prerequisite to judicial review under the APA. *See Alabama-Coushatta*, 757 F.3d at 489; 5 U.S.C. § 704. Under the governing test for finality, final agency actions are actions which (1) "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). "Conversely, a non-final agency order is one that does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Peoples*

*Nat'l Bank v. Office of the Comptroller of the Currency*, 362 F.3d 333, 337 (5th Cir. 2004) (cleaned up).

Plaintiffs' challenge falls into the latter category. If Plaintiffs challenge any discrete, non-programmatic agency action, they challenge only an intermediate, procedural step in the adjudications of several pending export applications. As the Department of Energy has explained, updating its studies "is an integral part of [the Department's] process for the public interest determination required by [Natural Gas Act] section 3(a)." ROA.1066. Far from consummating the Department's decision-making, the update is merely "a temporary step that is necessary so that [the Department] can avoid reliance on stale data and stale analyses." ROA.1066; ROA.1070.

A temporary delay while the Department gathers additional information does not conclusively determine the applicants'—much less Plaintiffs'—legal rights any more than a request for supplemental briefing after argument would conclusively resolve a case. *See Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 68 (D.C. Cir. 2000) ("A decision by an agency to defer taking action is not a final action reviewable by the court."). Applicants remain entitled to have their applications reviewed

with the presumption that the public interest favors the grant of non-free-trade-agreement export applications. As the Department explained to one applicant when the applicant submitted a request for rehearing on the update: "There has been no change in the status of Commonwealth's non-[free-trade-agreement] Application. It remains pending subject to [the Department's] ongoing review, which (as noted above) includes taking the steps that [the Department] determines are necessary to assess whether Commonwealth's proposed exports to non-[free-trade-agreement] countries are in the public interest." ROA.1070.

The district court's contrary conclusion was erroneous. The district court did not independently analyze the finality issue. Instead, it summarized the parties' positions and declared that it was "persuaded by" the States' argument. ROA.1389. The States asserted that the Department made a final decision that exports are not in the public interest until the update is complete. ROA.1387-89. That argument both mischaracterizes the Department's announcement and misunderstands finality law.

First, in the Department's announcement of the update, the Department did *not* state that the presumption would change; it only

"provided notice that it will initiate a process to update [its] assessments" and "until updated, [the Department] will pause determinations on pending applications for export of [liquefied natural gas] to non-Free Trade Agreement countries" to allow "the time to integrate [] critical considerations," such as market, economic, national security, and other factors. ROA.1045-47. So contrary to Plaintiffs' argument, applicants are still entitled to a presumption that exportation of natural gas is in the public interest when the Department adjudicates their applications. Indeed, the presumption is grounded in the Natural Gas Act's text, and the Department has not deviated from that text. Applicants simply must await a final determination based on sufficient information to know conclusively if the Department finds that, accounting for the presumption, their proposed export is in the public interest.

Second, Plaintiffs misunderstand the APA's finality requirement. Plaintiffs' theory would allow an interested person to challenge any (and every) intermediate step in an agency's decision-making process simply by claiming it is the culmination of that step. That theory is boundless. If Plaintiffs were correct, every step in the adjudication process—from

decisions about when to provide notice, to what type of notice to provide, to what issues to consider, to what studies to consider, and so on—would constitute another final determination that the proposed export is not in the public interest. Therefore, Plaintiffs fail to satisfy the finality test's first prong.

The second prong is also not met. On that prong, the district court stated only: "Plaintiff States further maintain that the [liquefied natural gas] Export Ban's mandatory language shows that it 'binds' the agency and 'accordingly gives rise to legal consequences.' " ROA.1389 (quoting *EEOC*, 933 F.3d at 441).

But nothing in the Department's update process or its public notice announces a new legal position that would bind Plaintiffs or the Department's staff. The Department's consideration of economic and environmental standards in the update is not new—they are the same standards that the Department has considered in making public-interest determinations for more than a decade, and which courts have affirmed. ROA.1045-47; *see, e.g.*, *Sierra Club I,* 867 F.3d at 203. A binding agency decision will come only at the end of the Department's process, when it issues final orders on pending applications. Thus, the

31

update and its attendant pause do not constitute final agency action because they only affect "rights adversely on the contingency of future administrative action." *Peoples Nat'l Bank*, 362 F.3d at 337 (cleaned up).

In reaching a contrary conclusion, the district court appeared to rely on *Texas v. EEOC*. But in that case, this Court explained that an "agency's guidance documents binding it and its staff *to a legal position* produce legal consequences." 933 F.3d at 441 (emphasis added). The district court did not identify any legal position to which the Department bound itself. Nor could it because the Department did not bind itself or its staff to any legal positions in its announcement of the update. Rather, it notified the public that—as it had previously—it would be conducting an update of its environmental and economic studies and would issue final decisions on pending export applications once the update was complete. That public statement is materially different from the agency guidance in *Texas*, which the agency did not dispute bound its staff and which this Court found "binds [] staff to an analytical method in conducting Title VII investigations and directs their decisions about which employers to refer for enforcement actions." *EEOC*, 933 F.3d at 443.

\*    \*    \*

The APA requires plaintiffs to identify a final, discrete agency action that is the object of their suit. Plaintiffs have failed to do so. The district court therefore lacked jurisdiction over Plaintiffs' claims challenging the Department of Energy's general approach to export adjudications.

## II.    The Natural Gas Act vests exclusive subject-matter jurisdiction over Plaintiffs' claims in the courts of appeals.

The district court also lacked subject-matter jurisdiction over Plaintiffs' complaint because Section 717r of the Natural Gas Act creates an exclusive path for judicial review of the Department's action or inaction related to liquefied-natural-gas export proceedings. The Act's exclusive review provision applies to all claims by any interested persons who seek to challenge the Department's action or inaction related to export authorizations, including applicants seeking to export liquefied natural gas, environmental groups, and States with an interest in the authorizations. The Natural Gas Act therefore required Plaintiffs to file their case directly in a court of appeals within 60 days after filing an application for rehearing with the Department. By filing in district court, Plaintiffs disregarded Congress' clear jurisdictional command. So even if

Plaintiffs had challenged a discrete, final agency action, the district court had no authority to entertain their suit in the first place.

> ### 1.   The Natural Gas Act precludes the district court from exercising jurisdiction.

Although Congress granted the federal district courts general subject-matter jurisdiction over all civil cases arising under federal law, 28 U.S.C. § 1331, Congress sometimes "leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts." *Bank of La. v. FDIC*, 919 F.3d 916, 922 (5th Cir. 2019). When Congress provides "[s]pecific grants of jurisdiction to the courts of appeals," those specific grants "override general grants of jurisdiction to the district courts." *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010). Absent a "firm indication" that Congress vested jurisdiction in a district court, "courts should construe ambiguity in a special statutory review provision as favoring jurisdiction in the courts of appeals rather than district court." 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Judicial Review of Administrative Action* § 8303 (June 2024 Update) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985)).

Here, there is no ambiguity: the Natural Gas Act establishes a "highly reticulated procedure" to challenge the Department's adjudication of natural-gas export applications. *Am. Energy v. Rockies Exp. Pipeline*, 622 F.3d 602, 605 (6th Cir. 2010). In the Act, Congress provided a single, straightforward path to judicial review: After seeking rehearing with the Department, "[a]ny party to a proceeding [for the exportation of natural gas] aggrieved by an order issued by the [Department] in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia." 15 U.S.C. § 717r(b).

The Natural Gas Act's review scheme applies not only to challenges to final orders, but also to allegations of unlawful failure to issue final orders. *See JTB Tools & Oilfield Servs. v. United States*, 831 F.3d 597, 599-601 (5th Cir. 2016); *see also Telecommc'ns Rsch. & Action Ctr. v. FCC (TRAC)*, 750 F.2d 70, 78 (D.C. Cir. 1984). And it extends to the intermediate steps the Department takes to adjudicate Natural Gas Act export applications. *See City of Tacoma v. Taxpayers of Tacoma*, 357 U.S.

320, 336 (1958); *Am. Energy Corp.*, 622 F.3d at 605. The Supreme Court

has interpreted the Federal Power Act's materially identical[4] exclusive-

review provision to "necessarily preclude[] de novo litigation between the

parties of all issues inhering in the controversy, and all other modes of

judicial review."[5] *City of Tacoma*, 357 U.S. at 336.

Because the Natural Gas Act's judicial review provision is

exclusive, "there is no area of review, whether relating to final or

preliminary orders, available in the district court." *Consol. Gas Supply

Corp. v. FERC*, 611 F.2d 951, 957 (4th Cir. 1979). And as the Fourth

Circuit observed four decades ago, "this has been the uniform

construction given the statute." *Id.*; *see also, e.g.*, *California Save Our

Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 911 (9th Cir. 1989)

---

[4] The Supreme Court has stated that the relevant provisions of the
Federal Power Act and the Natural Gas Act "are in all material respects
substantially identical" and noted that it has an "established practice of
citing interchangeably decisions interpreting the pertinent sections of the
two statutes." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 n.7 (1981)
(cleaned up).

[5] District courts retain jurisdiction over certain matters, not relevant
here, such as eminent domain proceedings, 15 U.S.C. § 717f(h), and
enforcement of the Department's orders, *id.* § 717u. That Congress
expressly granted district courts jurisdiction over those other matters
only confirms that it intended to preclude district-court jurisdiction over
issues related to orders authorizing natural-gas exports.

(rejecting plaintiffs' attempt to circumvent the Federal Power Act's exclusive review provision by "careful pleading" stating "that they are not attacking the licensing decision made by the [Federal Energy Regulatory Commission] but instead are seeking review only of the Forest Service's failure to follow the procedural and substantive steps outlined in statutes outside the purview of power and energy regulation"). Even earlier, in 1973, this Court affirmed in relevant part a district court's dismissal of a complaint seeking equitable relief against the Federal Power Commission (the Department's predecessor) for issuing an interim suspension order in a pending Natural Gas Act proceeding. *Atlanta Gas Light Co. v. Federal Power Comm'n*, 476 F.2d 142, 150 (5th Cir. 1973).

If judicial review of the Department's update may be had at all, it must be done by the courts that Congress has assigned to hear all such claims—the courts of appeals. *See Consol. Gas Supply Co.*, 611 F.2d at 957-58. For that reason, the district court "was without jurisdiction to interfere with the [Department's] proceedings through the issuance of an injunction." *Id.* at 958. The district court erred in concluding that, because Plaintiffs do not challenge an "order," their suit must fall outside the Natural Gas Act's exclusive review scheme. ROA.1375-76. If that

37

were true, then any person who disagreed with any step taken by the Department in a Natural Gas Act proceeding could immediately sue in district court. But the Natural Gas Act's exclusive review scheme extends to claims that are "inescapably intertwined" with the Department's export orders. *See Ligon*, 614 F.3d at 155 (cleaned up). After all, "[e]xclusive means exclusive, and the [Natural Gas Act] nowhere permits an aggrieved party otherwise to pursue collateral review . . . in state court or federal district court." *Am. Energy Corp.*, 622 F.3d at 605. For that reason, a plaintiff "may not circumvent the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court." *Ligon*, 614 F.3d at 155.

Plaintiffs' challenge is inescapably intertwined with the Department's adjudication of natural-gas export orders and amounts to an impermissible collateral attack on those adjudications. Each of Plaintiffs' claims challenge the Department's process in reaching a final order. The gravamen of Plaintiffs' complaint is that the Department lacks the authority to "halt" the issuance of final orders in pending export adjudications while it updates the studies that it relies on to make those final decisions. ROA.85-86. That Plaintiffs challenge the Department's

adjudication process broadly in a manner that affects several different proceedings rather than challenging an order in a particular proceeding does not render Plaintiffs' challenge *less* inescapably intertwined with export proceedings.

And as relief, Plaintiffs seek to permanently enjoin the Department from "attempting to halt the consideration of [liquefied-natural-gas] export applications." ROA.86. If Plaintiffs were to obtain that relief, the resulting orders granting or denying those applications would indisputably be subject to the exclusive jurisdiction of an appropriate court of appeals under the Natural Gas Act. *See* 15 U.S.C. § 717r. Plaintiffs cannot displace the courts of appeals' jurisdiction by preemptively challenging in district court the interlocutory steps in the Department's adjudications.

Indeed, even as the district court concluded that Plaintiffs' challenge was wholly collateral to the export adjudication process, the relief the court granted betrayed how intertwined Plaintiffs' claims are with the ongoing adjudications. After all, the district court preliminarily enjoined Defendants "from halting and/or pausing the approval process for pending and future applications for [liquefied-natural-gas] exports []

to non-[free-trade-agreement] countries, effectively immediately." ROA.1425-26. The district court thus intruded on *multiple* pending export authorization proceedings and interfered with the exclusive jurisdiction of the courts of appeals under the Natural Gas Act. *See* 15 U.S.C. § 717r.

Because Plaintiffs' claims are "inescapably intertwined" with the review of final orders under the Natural Gas Act, they must be brought in a court of appeals in the first instance. *Ligon*, 614 F.3d at 155.

> ### 2. Plaintiffs' claims are of the type that Congress intended to be reviewed exclusively in the courts of appeals.

The Supreme Court has "several times held" that the creation of a review scheme that provides for "review in a court of appeals following the agency's own review process" "divests district courts of their ordinary jurisdiction over the covered cases." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). "But a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action." *Id.* Thus, courts consider three factors, commonly known as the *Thunder Basin* factors, to determine "whether the particular claims brought were of the type Congress intended to be reviewed within this

statutory structure." *Id.* at 186 (cleaned up). "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise?" *Id.*

Few claims are so extraordinary that they fall outside a highly reticulated exclusive review scheme. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012) (Equal Protection Clause challenge must proceed through special review scheme requiring federal employees challenging discharge decisions to seek review first in the Merit Systems Protection Board); *cf. Axon*, 598 U.S. at 180 ("fundamental, even existential" separation-of-powers challenges to the structure of the agency were not of the type that Congress intended to preclude and thus a district court could hear those "extraordinary claims"); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) (same).

As to the first *Thunder Basin* factor, the Natural Gas Act does not "foreclose all meaningful judicial review" of Plaintiffs' claims. *Elgin*, 567 U.S. at 15 (cleaned up). To the contrary, the statute expressly provides for judicial review in the court of appeals. *See* 15 U.S.C. § 717r(b). In *Thunder Basin*, the Supreme Court explained that "statutory and

41

constitutional claims . . . can be meaningfully addressed in the Court of Appeals," and that the case accordingly did "not present the 'serious constitutional question' that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." 510 U.S. at 215 n.20 (cleaned up).

Plaintiffs' situation is unlike the one in *Free Enterprise*, where the Supreme Court determined that the Act in question did not provide a meaningful opportunity for judicial review because it required the plaintiff to voluntarily "incur a sanction" at the agency level to raise its constitutional claim in the circuit court, risking "severe punishment should its challenge fail." 561 U.S. at 490. Nor are Plaintiffs' claims like the ones in *Axon*, where plaintiffs alleged harm from being subjected to an unconstitutional proceeding before an administrative law judge. 598 U.S. at 191. That injury, the Court concluded, was "impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Id.*

The district court suggested that Plaintiffs may have no meaningful review because in Commonwealth LNG, LLC's administrative challenge to the "pause," the Department concluded that Commonwealth was not aggrieved by a final order and therefore dismissed its request for

rehearing. ROA.1374-75. The district court assumed that the Department would have similarly rejected Plaintiffs' claims if they had attempted to first seek review with the Department pursuant to the Natural Gas Act's review scheme. ROA.1374-75.

But the question is not whether Plaintiffs' contentions will be meaningfully addressed in the *administrative* process. The question is whether Plaintiffs' claims will be meaningfully addressed through the statutory mechanism for administrative *and* judicial review as a whole, with an emphasis on the latter. *See Thunder Basin*, 510 U.S. at 212-13 (inquiry particularly important "where a finding of preclusion could foreclose all meaningful *judicial* review") (emphasis added). In fact, in *Thunder Basin* itself, the Supreme Court held that the statutory review mechanism was meaningful, adequate, *and* exclusive "[e]ven if" the administrative agency would not or could not adjudicate the statutory and constitutional claims at issue there, because those issues ultimately would "be meaningfully addressed" on judicial review. *Id.* at 215; *see also Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 198 (3d Cir. 2018) (holding that the Natural Gas Act's judicial review provision provided meaningful review of Religious Freedom Restoration Act claim).

The same is true of the claims that Plaintiffs seek to raise here. After the Department's denial of Commonwealth's rehearing petition, Commonwealth could have filed a petition for review in this Court to obtain review of its claims, though it chose not to. *See* 15 U.S.C. § 717r(b). Congress provided Plaintiffs the same path to judicial review through the Natural Gas Act's review scheme, but they have not availed themselves of it.[6]

Shorn of the unfounded "Export Ban" label, the true gravamen of Plaintiffs' complaint is that the Department is unlawfully withholding final action on pending liquefied-natural-gas export applications. It is well settled that, in statutes like the Natural Gas Act, where Congress assigns exclusive jurisdiction to review agency actions to a court of appeals, exclusive jurisdiction extends to allegations of unlawful failure to act. *See JTB Tools*, 831 F.3d at 599-601; *see also TRAC*, 750 F.2d at 78

---

[6] Plaintiffs are not presently parties to the pending export proceedings because they have not requested to intervene in those proceedings. The Natural Gas Act expressly contemplates that States may become parties to proceedings and seek rehearing and judicial review if they are aggrieved. 15 U.S.C. § 717r. That Plaintiffs have shunned the path that Congress set forth for them does not mean that Plaintiffs' claims cannot be meaningfully addressed through Congress' scheme.

(holding that an exclusive-review provision encompassed challenges to an agency's unreasonable delay in issuing a decision). So the proper avenue for Plaintiffs' concerns—whatever their merits—would be a mandamus claim in the court of appeals for unlawful failure to issue export decisions, not an APA action in district court.

Channeling the review of agency inaction to the courts of appeals is necessary to protect those courts' "future jurisdiction." *TRAC*, 750 F.2d at 76; *In re Howard*, 570 F.3d 752, 756 (6th Cir. 2009). Otherwise, "the statutory obligation of a Court of Appeals to review on the merits" specific agency actions could "be defeated" by plaintiffs who "file preemptive suits in the district court and thereby avoid the court of appeals." *Id.* at 756 (cleaned up). Thus, this Circuit has joined other circuits in agreeing that claims involving agency inaction are subject to the court of appeals' exclusive jurisdiction. *See JTB Tools*, 831 F.3d at 600, 601 n.4 (collecting cases).

In *Bywater Neighborhood*, for example, plaintiffs brought an APA action in district court. *Bywater Neighborhood Ass'n v. Tricarico*, 879 F.2d 165, 168 & n.14 (5th Cir. 1989). Plaintiffs challenged the Federal Communications Commission's " 'deferred' action" on a licensing order

and argued that the agency patently abused its authority. *Id.* at 166. This Court concluded that the district court lacked jurisdiction because Congress established a special review process that provided—similar to Section 717r—that "appeals may be taken before the District of Columbia Circuit '[b]y any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application . . . .' " *Id.* at 169. Challenges to agency inaction, no less than challenges to the ultimate agency action, can be brought only under that exclusive review scheme. *Id.*

Here, the district court concluded that "Plaintiff States challenge the Secretary's exercise of her 'power generally' to not 'proceed at all,' but is not challenging how the Secretary wielded her power in a particular application proceeding." ROA.1375. To start, the fact that Plaintiffs launch a programmatic challenge rather than challenging a particular proceeding is a separate jurisdictional defect. *See supra* Part I. The district court cannot evade one jurisdictional problem by steering headfirst into another. But more to the point, the district court understood Plaintiffs' claims as a challenge to inaction—in other words, to the Secretary's decision "to not proceed at all." ROA.1375. The Natural

Gas Act requires that such agency-inaction claims be brought only in the courts of appeals. *See JTB Tools*, 831 F.3d at 599-601.

As to the second *Thunder Basin* factor, Plaintiffs' claims are not wholly collateral because their claims are directly tied to—and indeed request action on—pending liquefied-natural-gas export proceedings. *See Heckler v. Ringer*, 466 U.S. 602, 614-85 (1984) (holding that plaintiffs' APA claims challenging an agency rule were not wholly collateral to a scheme of administrative and judicial review of Medicare payment decisions because their challenge was "at bottom" a request to invalidate the agency's rule so that the agency would issue future benefits decisions). In fact, the district court's injunction implicitly compelling the Department to grant or deny pending applications using outdated studies rather than the updated studies reveals how interconnected Plaintiffs' claims are to the issuance of final orders.

The final factor—agency expertise—also supports exclusive jurisdiction over Plaintiffs' claims in the courts of appeals. Plaintiffs challenge the Department's process for evaluating liquefied-natural-gas export applications—in particular, its process to determine whether exports would "not be consistent with the public interest." The

Department, not Plaintiffs or the district court, has the requisite technical expertise to know when and how to update the studies necessary to make an informed public-interest determination. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267-68 (2024).

Resolution of those threshold determinations would aid meaningful judicial review by the circuit courts where venue is appropriate. *See Elgin*, 567 U.S. at 23 (concluding that agency expertise could be brought to bear on threshold questions despite agency's lack of specific expertise with Equal Protection claims); *Thunder Basin*, 510 U.S. at 214-15 (concluding agency expertise could be brought to bear despite the agency's lack of expertise in interpreting a particular statute).

### 3.    Plaintiffs cannot bypass the exclusive judicial review scheme established by Congress.

The Natural Gas Act's judicial-review scheme applies expressly to States, providing States a path to judicial review by allowing them to become a party to an export proceeding and file an application for rehearing. 15 U.S.C. § 717r. Neither the district court's flawed reasoning nor the States' other arguments provide grounds to evade the Act's exclusive route for judicial review.

First, the district court erroneously reasoned that Plaintiffs' failure to follow that statutorily prescribed process by intervening in any particular adjudication gave them license to skip the exclusive review process and challenge a so-called rule that "applies broadly to all applications." ROA.1375. That approach is foreclosed by the Supreme Court's decision in *Ringer*.

In *Ringer*, one of the named plaintiffs sought to challenge an agency rule that precluded Medicare reimbursement for a particular type of operation that he wished to undergo. *Ringer*, 466 U.S. at 604-05. Because Ringer had not undergone that procedure, he could not file a claim for reimbursement under the Medicare Act's review scheme. Accordingly, he brought a "pre-enforcement" action in district court requesting a judgment that the Medicare regulation was invalid. *Id.* at 621-23. But the Supreme Court held that plaintiff's claim was still barred by the Medicare Act's exclusive review scheme. *Id.* at 614-615.

Even though the plaintiff in *Ringer* could not even begin to participate in the adjudication process because he had no reimbursable expenses to constitute a claim to Medicare benefits, the Supreme Court "fail[ed] to see how" the fact that plaintiff had not "satisfied all of the

prerequisites to jurisdiction under [a special review scheme] has anything at all to do with the proper construction of [that scheme]." *Ringer*, 466 U.S. at 621; *see also id.* at 624 (rejecting the argument that a plaintiff's "claim somehow changes and 'arises under' another statute simply because he has not satisfied the procedural prerequisites for jurisdiction which Congress has prescribed"). That reasoning applies all the more forcefully here, where Congress has provided the States a straightforward path to review.

At bottom, like in *Ringer*, Plaintiffs' suit for anticipatory relief is simply an effort to bypass the reticulated mechanisms for administrative and judicial review provided by the Natural Gas Act. Seeking to avoid the need to bring challenges in the context of specific decisions, Plaintiffs filed the current facial challenge to the Department's purported "Export Ban" in an effort to obtain programmatic and intrusive relief. This Court and the Supreme Court have repeatedly rejected such attempts to circumvent statutory review processes.

Second, it is of no moment that Plaintiffs purport to challenge a standalone "final agency action" under the APA. Even if the Department's decision to update its economic studies were erroneously

conceived of as final agency action separate from the Department's adjudications, that decision would still fall within the Natural Gas Act's exclusive review scheme.

In *Ringer*, plaintiffs purported to challenge a rule under the APA to try to invoke federal-question jurisdiction under Section 1331, rather than comply with a separate review scheme. Plaintiffs there, like Plaintiffs here, challenged the Secretary's authority to issue the challenged action and the Secretary's "failure to comply with the rulemaking requirements of the APA in issuing the [policy]." *Id.* at 614. But the Supreme Court concluded that plaintiffs' purportedly standalone APA claim was barred by the Medicare Act's exclusive review scheme. *Id.* at 614-15; *see also id.* at 623 ("[T]oday we explicitly hold that our conclusion that [plaintiffs'] claims . . . are barred by [the special review scheme] is in no way affected by the fact that those respondents did not seek an award of benefits."). The same logic applies to the Natural Gas Act's exclusive review scheme.

The APA itself confirms the exclusivity of the Natural Gas Act's review procedures. The APA states that where Congress has provided a "special statutory review proceeding relevant to the subject matter,"

complainants must use that "form of proceeding for judicial review," unless it is "inadequa[te]." 5 U.S.C. § 703. Moreover, Section 704 of the APA bars resort to its general provisions for judicial review of agency action unless "there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA thus "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (cleaned up). As this Court put it, the APA is "not a proper vehicle for circumventing the special statutory review process." *Bywater Neighborhood Ass'n*, 879 F.2d at 168.

The foregoing principles foreclose Plaintiffs' suit here. Plaintiffs do not challenge any discrete, final agency action. *See supra* Part I. But if Plaintiffs' characterization of the Department's update were accepted, as the district court did, Plaintiffs' claims are reviewable only under Section 717r of the Natural Gas Act because they seek to challenge a "regulation" governing the adjudication of export applications. *See Ringer*, 466 U.S. at 621-22 (requiring challenge to rule governing agency adjudications to be brought through special statutory review scheme). "For nearly four decades, it has been blackletter administrative law that, absent

countervailing indicia of congressional intent, statutory provisions for direct review of orders encompass challenges to rules." *New York Republican State Comm. v. SEC*, 799 F.3d 1126, 1129 (D.C. Cir. 2015); *see also Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 546 F.2d 983, 986 (D.C. Cir. 1976) (holding that judicial review under the Natural Gas Act does not hinge on "the distinction between rulemaking and adjudication"). Plaintiffs' attempted end-around is expressly what the Natural Gas Act and the APA prohibit.

There is good reason for that prohibition. Permitting Plaintiffs to use a broad APA challenge to bypass the mechanisms for review provided by the Natural Gas Act would give rise to the very dangers that the Natural Gas Act seeks to avoid. Because Plaintiffs seek to raise their claims in the abstract rather than in connection with a specific application of the purported rule, "the scope of the controversy" has not been "reduced to more manageable proportions," *Lujan*, 497 U.S. at 891; instead, it remains unwieldy and unmanageable, a broad-ranging attack on the Department's process for adjudicating pending applications. The correspondingly broad relief Plaintiffs seek also creates a real risk that premature judicial interference could have serious

consequences for the agency and applicants alike by forcing premature decisions that lack an adequate basis. And allowing duplicative APA litigation in district courts undermines a core purpose of the Natural Gas Act's exclusive review provision, which provides export companies more efficient resolution of challenges to orders granting export authorization. *See Florida Power*, 470 U.S. at 740 ("[t]he most obvious advantage of direct review by a court of appeals is the time saved compared to review by a district court, followed by a second review on appeal").

## III.   Plaintiffs lack Article III standing.

The "irreducible constitutional minimum" of standing requires that a plaintiff have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The party invoking federal jurisdiction bears the burden of establishing these elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The requirement of a judicially cognizable injury "helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned

up). The alleged injury must represent an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (cleaned up). The injury must be "certainly impending," and allegations of "possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). And standing is "substantially more difficult to establish" when the party bringing suit "is not himself the object of the government action or inaction he challenges." *Lujan*, 504 U.S. at 562. Plaintiffs have not cleared that high bar.

### A.  Plaintiffs failed to establish standing to sue the federal government for indirect and speculative future losses in revenue.

Plaintiffs have not suffered any "direct injury" at the hands of the federal government. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). A State may suffer direct injury, for example, when the challenged action directs a State to act or to refrain from acting, determines how much federal funding a State receives, or deprives a State of a legal right. But the Department's temporary deferral of final decisions in pending export adjudications has no direct effect on any of the Plaintiffs. Rather, Plaintiffs assert that delays in the Department's adjudicatory process,

combined with third parties' reactions, will eventually reduce the revenue that the States anticipate receiving in the form of royalties and taxes. That theory of standing fails for two reasons. First, a state may not sue the federal government based on such indirect, derivative effects.[7] And second, Plaintiffs simply speculate that they will feel those effects—they do not establish a likelihood of harm.

1. Federal policies routinely have incidental effects on States' expenditures. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Those indirect effects are not judicially cognizable injuries. *Florida*, 273 U.S. at 18. Plaintiffs' contrary view would allow any State to sue the federal government about virtually any policy—sharply undermining Article III's requirements and the separation-of-powers principles they serve. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) ("Standing is built on a single basic idea—the idea of separation

---

[7] Nor can Plaintiffs bolster their claim to standing by requesting "special solicitude in the standing inquiry." Such "special solicitude does *not* eliminate the state [plaintiff's] obligation to establish a concrete injury." *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012) (cleaned up); *see also Texas*, 599 U.S. at 689 (Gorsuch, J., concurring in the judgment) (suggesting that "lower courts should just leave [the idea of special solicitude] on the shelf in future [cases]").

of powers."). Virtually any federal action, from prosecuting crime to imposing taxes to managing federal property, could be said to have some incidental effect on state finances. If such attenuated downstream effects satisfied Article III, the federal courts would become "an open forum for" States "to press general complaints about the way in which government goes about its business." *Id.* at 379 (cleaned up).

Article III does not give States license to challenge every federal action that generates indirect effects on its revenues. *See El Paso County v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020). In *Florida v. Mellon*, for example, the Supreme Court held that Florida lacked standing to challenge the constitutionality of a federal inheritance tax. 273 U.S. at 18. Florida argued that the tax would cause the state financial harm by prompting the "withdrawal of property" and diminishing its tax base. *Id.* at 16. But the Court rejected that theory, explaining that Florida was required to show a "*direct* injury," and any harm caused by the tax was, "at most, only remote and indirect." *Id.* at 18.

In particular, this Court has held that "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso County*, 982 F.3d at 340. Plaintiffs assert that their injuries are

Case: 24-30489    Document: 65    Page: 68    Date Filed: 11/01/2024

judicially cognizable because they have identified "specific" tax revenues rather than simply "general" tax revenues. *See id.* But labeling a tax revenue stream as "specific" does not make the monetary injury "direct," *Florida*, 273 U.S. at 18, or "certainly impending," *Clapper*, 568 U.S. at 409. Plaintiffs' purported injuries here are not direct. Instead, they rely on an attenuated chain of causation that assumes that the Department's update will reduce third-party investments, therefore reducing the amount of natural gas that natural-gas companies choose to produce, therefore reducing state revenues from natural-gas production.

2. Plaintiffs' standing theory relies on layers of speculation. Plaintiffs allege that they will suffer harm in the form of "loss of jobs and revenue streams tied to [liquefied natural gas]." ROA.53. Plaintiffs rely on a chain of assumptions that a deferral of final decisions will (1) "decrease investment in the natural gas industry and infrastructure," (2) "leading to decreased production" and therefore (3) leading to "loss of specific tax revenues for Plaintiff States," a reduction in royalty payments, and loss of their citizens' jobs.[8] ROA.54-55. Plaintiffs' string of

---

[8] Plaintiffs also lack standing to bring claims against the federal government on behalf of their citizens for theoretical job losses. *Haaland*

assumptions is a far cry from a non-speculative, certainly impending financial injury.

Plaintiffs fail to explain why the timing of the adjudication of pending export applications will predictably decrease investment and natural-gas production in their States. Many other factors are substantially more likely to influence the independent business decisions of companies with pending export applications. For example, companies in Plaintiff States might want to produce natural gas to sell domestically, to export to free-trade countries, or to export to non-free-trade-agreement countries under existing authorizations, among other business purposes. The purported "Ban" does not affect that. *See* ROA.1093. Even within the realm of non-free-trade-agreement exports, the Department has approved a cumulative volume of approximately 49 billion cubic feet per day of liquefied-natural-gas exports to non-free-trade-agreement countries, yet the United States' actual current operating export capacity

---

*v. Brackeen*, 599 U.S. 255, 295 (2023) ("[a] State does not have standing as parens patriae to bring an action against the Federal Government"); *El Paso Cnty.*, 982 F.3d at 338 (rejecting standing claim based on loss of 62,000 jobs). And Plaintiffs cannot assert a free-standing claim to "deprivation of a procedural right," ROA.1383, because "a procedural right in vacuo—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

is only about 30 percent of that number. ROA.1050; ROA.1034; ROA.1086. Plaintiffs fail to show that more immediate export approvals would affect production (and therefore their revenues) when approximately 70 percent of approved export volume is not yet being used by industry.

Even if the Department granted all pending applications today, the Department has noted that it is highly uncertain that "all or even most of the proposed [liquefied-natural-gas] export projects will ever be realized because of the time, difficulty, and expense of commercializing, financing, and constructing [liquefied-natural-gas] export terminals, as well as the uncertainties and competition inherent in the global market for [liquefied natural gas]." ROA.1041. Many liquefied-natural-gas projects with Department-approved exports never make it off the ground for various reasons that are unrelated to the length of the Department's review. Nearly half of the cumulative export volume approved by the Department is associated with export facilities that are not currently operating or under construction. *See* ROA.1034.

Plaintiffs' speculative theory also disregards the fact that the export-authorization process often does not end with the Department's

order. Instead, environmental and other groups may seek vacatur of those orders in the courts of appeals. *See, e.g.*, *Sierra Club v. U.S. Dep't of Energy*, 703 Fed. App'x 1 (D.C. Cir. 2017); *Sierra Club I*, 867 F.3d at 203. If the Department relies on stale analyses, as Plaintiffs seek to compel it to do, the risk of vacatur increases—potentially delaying operations, and the expenditures on which Plaintiffs' standing theory relies. Those delays could last far longer than it takes the Department to simply update its studies now. So by ensuring that it relies on up-to-date analyses, the Department may actually help natural-gas companies avoid the costs and delays associated with remand or vacatur of their export authorizations.

Countless contingencies may arise in the coming years that break Plaintiffs' chain of inferences. Obtaining the financial investment to construct a multi-billion-dollar natural-gas export facility is a long-term endeavor, with most projects taking several years. ROA.1098. Even after a large-scale export facility completes the permitting process and reaches a final investment decision, there are typically another two to five years or more of construction activities before the facility is ready to commence exports. ROA.1104. Texas's alleged projected losses, for example, do not

begin for at least 3-7 years. ROA.657. That is because Plaintiffs will not realize revenues until the facilities are approved, financed, built, and exporting. Only then could Plaintiffs see increased revenues from increased natural gas production flowing to those export facilities. It is highly difficult to predict how the timing of decisions now will affect state revenues several years down the road. For example, an export authorization that comes a few months later than originally anticipated may provide companies access to more favorable capital-market conditions. Or the timing of authorizations could allow for more favorable construction contracts, ultimately expediting construction. Or changing world events could lead to more profitable contracts with liquefied-natural-gas buyers. Any one of myriad contingencies could upend Plaintiffs' theory, resulting in greater revenues for the States than they would have realized without the update.

At bottom, although Plaintiffs speculate that they will enjoy greater royalties and tax revenue if they manage to compel the Department to alter its process for reviewing export applications, ample commercial experience to date demonstrates that additional liquefied-natural-gas export approvals do not necessarily result in realized exports and

additional money in Plaintiffs' coffers. And the timing of authorizations could have multiple, unpredictable effects on downstream State revenues. It is nearly impossible to reliably predict the effects of delays on future private business decisions that may or may not come years down the line. Plaintiffs have therefore failed to carry their burden to allege specific facts that establish that they will suffer a certainly impending, non-speculative injury.

3. The indirect and speculative nature of Plaintiffs' alleged injuries also poses a redressability problem. "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court. In keeping with this principle, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). Plaintiffs' standing theory requires that impermissible guesswork. For their injuries to be redressable, the Court must assume without evidence that with the Department enjoined, private parties will choose to increase their investments and boost natural-gas production, thus increasing the States' revenues. But notably, those private parties—

who are in the best position to assess the effect of the update on *their* export applications and *their* business decisions—have not joined the States' suit or themselves sought judicial review. Plaintiffs' assertions fall far short of "the predictable effect of Government action on the decisions of third parties"; they can only "speculat[e] about the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019).

## B. Plaintiffs' lack of standing is even clearer with respect to their claims against the President.

At a minimum, Plaintiffs lack standing to bring their claims against the President.[9] Those claims should be dismissed for lack of standing and the preliminary injunction against the President vacated. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."); ROA.1400-02; ROA.1425.

---

[9] Because the President's actions are not subject to APA review, *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the district court correctly dismissed certain claims brought against the President. It is not apparent whether Counts X and XI were dismissed. *Compare* ROA.1423, *with* ROA.1425. But Plaintiffs did not object to the dismissal of Counts X and XI against the President. ROA.1251.

The only action by President Biden that Plaintiffs point to is the President's statement "declaring that his Administration is announcing today a temporary pause on pending decisions of Liquefied Natural Gas exports." ROA.50 (cleaned up); *see also* ROA.84. As the Complaint further explains: "The decision to which President Biden referred is a statement released the same day by the Department of Energy as a webpage." ROA.50.

Plaintiffs do not show how the President's statement will cause them any certainly impending injuries. Nor do they show how any available relief against the President could redress their purported injuries when the export authorization decisions that they seek to compel are made by the Department of Energy. Courts generally lack "jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802-03 (cleaned up); *see id.* at 802 ("[I]njunctive relief against the President himself is extraordinary, and should . . . raise [] judicial eyebrows."). In addition to that jurisdictional defect, the only relief that Plaintiffs have requested against any action by the President specifically is to "[d]eclare that President Biden's Proclamation is ultra vires." ROA.85. But that declaratory relief would

not affect the injuries that Plaintiffs have alleged. Plaintiffs have therefore failed to meet their burden to show standing to bring their claims against the President.

*     *     *

Ultimately, standing doctrine requires that the proper party bring suit and "protect[s] the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 379 (cleaned up). Plaintiffs—who are not applicants or parties in any pending export proceeding—are at most affected in an indirect and attenuated way. Thus, they lack standing to bring this suit. That the States here have failed to adequately allege standing does not "foreclose the possibility that a future plaintiff may be able to show clear injury-in-fact . . . but the federal courts must withhold judgment unless and until that plaintiff comes forward." *Barber*, 860 F.3d at 358.

# CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction order and instruct the district court to dismiss the complaint for lack of jurisdiction.

Respectfully submitted,

*Of Counsel:*

SAMUEL T. WALSH
*General Counsel*

COURTNEY MEYER
LILA NOJIMA
*Attorneys*
U.S. Department of Energy

s/ *Arielle Mourrain Jeffries*
TODD KIM
*Assistant Attorney General*

JUSTIN D. HEMINGER
ARIELLE MOURRAIN JEFFRIES
  *Attorneys, Appellate Section*
  *U.S. Department of Justice*
  *Environment & Natural*
  *Resources Division*

November 2024
90-1-0-17585

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

s/ *Arielle Mourrain Jeffries*
ARIELLE MOURRAIN JEFFRIES

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,834 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century font.

s/ <em>Arielle Mourrain Jeffries</em>

ARIELLE MOURRAIN JEFFRIES
